**IN THE COURT OF APPEALS OF IOWA**

No. 25-1473
Filed December 17, 2025

**IN THE INTEREST OF D.M.,**
**Minor Child,**

**V.B., Father,**
        Appellant.

_____

Appeal from the Iowa District Court for Linn County, Cynthia S. Finley, Judge.

A father appeals the termination of his parental rights.  **AFFIRMED.**

David R. Fiester, Cedar Rapids, for appellant father.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Julie G. Trachta of Linn County Advocate, Inc., Cedar Rapids, attorney and guardian ad litem for minor child.

Considered without oral argument by Tabor, C.J., and Badding and Sandy, JJ.

**BADDING, Judge.**

An out-of-state father who had little contact with his young son, born in 2019, appeals the termination of his parental rights.[1]  In terminating the father's parental rights, the juvenile court found that he did not make "significant efforts to develop and maintain a true father-son relationship, despite encouragement and offers of assistance to do so."  Upon our de novo review of the record, we agree.

## I.      Background Facts and Prior Proceedings

For the first three years of his child's life, the father was mostly absent.  He lives in Indiana and has six other children.  The mother did not tell the father about the child until he was around one year old.  According to the father, when he asked for a paternity test, the mother got mad and "tried to play keep-away" with the child, moving to Washington and then Iowa.  The test was eventually completed in January 2023, confirming the father's paternity.  Six months later, the State petitioned to have the child adjudicated in need of assistance because of concerns about the mother's drug use, mental health, and domestic violence.[2]

The mother—who was generally uncooperative—refused to reveal the father's name.  But by September 2023, a social worker with the Iowa Department of Health and Human Services identified the father.  The child was removed from his parents' custody that month and adjudicated in need of assistance.  Because the father lived in Indiana, the department could not place the child with him until

---

[1] The mother's parental rights were also terminated, but she does not appeal.
[2] The mother's three youngest children were also adjudicated.  None of those children, who have different fathers, are at issue here.

an interstate compact home study was completed. The home study was approved in January 2024, when the permanency goal was still reunification with the mother.

For the next few months, the father's contact with the child was limited to phone calls and video chats. He participated in those calls regularly, and he also stayed in contact with the foster family. In April, the father had his first in-person visit with the child. Another visit took place after an August permanency hearing. Due to the mother's lack of progress, the juvenile court changed the permanency goal to "sole custody with the father." However, the department did not immediately place the child with the father because they had not yet established a relationship with one another.

Unfortunately, the father's contact with the child and his foster family decreased after the permanency goal was changed. He passed up an opportunity to have the child with him in Indiana for a week, citing financial concerns even though the department offered food, gas, and hotel assistance. By February 2025, the social worker for the department noted the father was not communicating directly with the child and had "not maintained a meaningful relationship" with him during that reporting period. Despite this turn of events, the department was still focused on placing the child with the father. So, in March, after the father's initial home study expired, the department asked for a new one to be completed.

The father was upset that he had to go through the home study process again and became uncooperative with child services in Indiana. Because he failed to follow through with a required home visit, the second home study was denied in May. The department requested a third home study later that month. This time, the father was openly hostile with the workers in Indiana. One reported that when

she called the father to schedule a home visit, he "was very upset, yelling and cursing" about how he did not want to go through the process again. Later that day, a report was made to child services in Indiana about a domestic incident between the father and his girlfriend. While investigating that report, a worker who visited the father's home saw marijuana on the coffee table in the living room. Although the father admitted that he used marijuana, he refused to take a drug test.

The next week, two other workers went to the father's home to complete the home visit portion of the study. They both reported that the home smelled like marijuana, and they observed a "fist-sized hole" in the dining room wall. The father told the workers that he has a bipolar diagnosis and that "if he forgets to take his medications, he is manic and angry." He also told them "that he uses 'dabs' or a glass pipe at least once per day" because "it helps him sleep and gives him an appetite." The father's girlfriend said that she regularly used marijuana too. And the couple "admitted to smoking marijuana while the children are home." But they denied any domestic violence—even though the children reported witnessing it.

Citing the couple's admission of marijuana use and "ongoing concerns of domestic violence," the Indiana Department of Child Services denied the father's home study in June. When a worker from Indiana called the father to tell him about the denial, he "immediately became upset" and threatened her. With these developments, the department recommended proceeding to termination of parental rights. The child's guardian ad litem agreed, reporting the father's lack of communication with the child "appears to be indicative of his commitment to having [the child] in his care."

A termination hearing was held in August. The father participated by telephone but left once his testimony was finished. After hearing from the father and the department's social worker, the juvenile court granted the State's petition and terminated the father's parental rights under Iowa Code section 232.116(1)(b), (e), and (f) (2025).[3] The father appeals.

## II. Analysis

We review termination of parental rights proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). In conducting that review, we use a familiar three-step process to determine whether (1) a statutory ground for termination has been established, (2) termination is in the child's best interests, and (3) any permissive exceptions should be applied to preclude termination. *In re A.B.*, 957 N.W.2d 280, 294 (Iowa 2021). While the father has combined some of these steps in his petition on appeal, we understand from his arguments that he is challenging each step in the termination analysis.[4]

---

[3] In the decretal portion of the termination ruling, the court stated the father's parental rights were terminated under Iowa Code section 232.116(1)(h). We believe this was a typographical error because paragraph (h) applies to children who are three years of age or younger, while paragraph (f) applies to children who are four years of age or older. Iowa Code § 232.116(1)(f)(1), (h)(1). The court's findings of fact and conclusions of law accurately stated the child was six years old and found clear and convincing evidence to terminate the father's rights under paragraph (f). *See In re A.A.*, No. 21-1972, 2022 WL 946503, at *3 (Iowa Ct. App. Mar. 30, 2022) ("The erroneous reference to paragraph (f), a presumed typographical error, therefore 'has no legal significance.'" (citation omitted)); *In re H.C.*, No. 16-1961, 2017 WL 512798, at *2 (Iowa Ct. App. Feb. 8, 2017) ("[W]e decline to place form over substance and waste judicial resources on what was clearly a clerical error.").

[4] The father also suggests, without further elaboration or citation of authority, that he should have been granted "an additional six (6) months to achieve reunification." "But, as we have held before, 'sprinkled mentions of an issue' are insufficient to raise legal claims for our consideration." *In re K.P.*, No. 23-1661, 2024 WL 260885, at *3 (Iowa Ct. App. Jan. 24, 2024) (citations omitted); *see also*

### A.      Statutory Ground

The father challenges the three statutory grounds the juvenile court relied on to terminate his parental rights.  When the court relies on multiple statutory grounds, we may affirm based on any ground supported by the record.  *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012).  We focus on section 232.116(1)(f).  The father only challenges the last element of that ground, which requires the State to prove by clear and convincing evidence that the child cannot be safely returned to the parent's custody at the present time.  *See* Iowa Code § 232.116(1)(f); *see also In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (interpreting the statutory phrase "at the present time" to mean at the time of the termination hearing).

The father testified that before this child welfare proceeding began, he had only met the child two or three times.  Once the department found the father in Indiana, the social worker said that her "only expectation" was for him to "create a bond and a relationship" with the child.  The father initially had consistent phone and video contact with the child, but that faded as the case progressed.  By the termination hearing in August 2025, the father had only seen the child in person three times—despite the department's offers for more visits.  And what little phone and video contact he had with the child in the months before the hearing was brief.  Because of this limited contact, the social worker testified the child was not sure who the father was and treated him like a stranger.

---

*Soo Line R.R. v. Iowa Dep't of Transp.*, 521 N.W.2d 685, 691 (Iowa 1994) (noting that a "random mention" of an issue, "without elaboration or supportive authority, is insufficient to raise the issue for our consideration").  Even if the father had elaborated on this issue, it was not preserved for our review because the juvenile court did not address it.  *See In re L.A.*, 20 N.W.3d 529, 533 (Iowa Ct. App. 2025) (en banc).

The social worker was also concerned about the events detailed by child services in Indiana during the renewed home study process. Workers there described the father as "volatile and all over the place from being hostile to calm." They also reported seeing marijuana in the home and signs of domestic violence. Due to those concerns, the home study was denied. The father denied everything reported by the workers in Indiana, claiming "it was all false accusations." We, like the juvenile court, find that difficult to believe. *See In re D.W.*, 791 N.W.2d 703, 706 (Iowa 2010) ("We are not bound by the juvenile court's findings of fact, but we do give them weight, especially in assessing the credibility of witnesses."). In any event, without an approved interstate compact home study, the child could not be placed with the father in Indiana. *See* Iowa Code § 232.158(3)(d).[5] As a result, the State met its burden of proof under section 232.116(1)(f). *See In re K.R.*, No. 24-0995, 2024 WL 3887223, at *3 (Iowa Ct. App. Aug. 21, 2024) (affirming termination under paragraph (f) because the lack of an approved interstate compact home study "prevented the juvenile court from returning [the child] to the mother's custody").

## B.     Best Interests

The father next claims that termination is not in the child's best interest, partly because a long-term placement had not been identified at the time of the

---

[5] Among other conditions for placement, this provision states that a child
shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

Iowa Code § 232.158(3)(d).

termination hearing. He also argues that he did his best to foster an emotional bond with the child. *See In re L.A.*, 20 N.W.3d 529, 535 (Iowa 2025) (en banc) ("[T]he parent-child bond is a relevant consideration in the best-interests analysis."). The juvenile court concluded otherwise, finding:

> [The child's] father has participated in the case in the most minimal of ways. He had very few case plan responsibilities. He had the opportunity to visit with [the child] and forge a relationship with him that had been denied before [the department] and the court became involved. He did not take the slightest advantage of that opportunity, claiming the distance prevented him from visiting with [the child]. He participated in only two visits with his son throughout the case.[6] His participation in video/phone calls with [the child] were sporadic at best and decreased over time. His communication with the foster parent and [the department] became less as the case progressed. At the time of the pretrial conference on the termination matter, there had been no contact between [the child] and his father in over two months. [The child's] behaviors can be challenging and consistency is critical to his well-being and success. His parents have not demonstrated the ability or willingness to provide this for him.

We agree upon our de novo review of the record. *See* Iowa Code § 232.116(2) (requiring us to "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child" in assessing a child's best interests). Although the department had not yet located a permanent home for the child, he deserves the opportunity to find one without further delay. *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will

---

[6] We understand from our review of the record that the father had a total of three visits with the child—one in April 2024, another in August 2024, and a third shorter visit after a court hearing in June 2025.

learn to be a parent and be able to provide a stable home for the child." (citation omitted)); *see also In re T.M.*, No. 25-0252, 2025 WL 1706566, at *2 (Iowa Ct. App. June 18, 2025) (finding termination was in the children's best interests even though adoptive homes had not yet been secured for them).

### C. Permissive Exception

Citing the "closeness of the parent-child relationship," the father claims the juvenile court erred in failing to apply the permissive exception to termination in Iowa Code section 232.116(3)(c). *See A.S.*, 906 N.W.2d at 475 (noting the exceptions listed in section 232.116(3) "are permissive, not mandatory" (citation omitted)). That provision allows the court to avoid terminating a parent's rights when "[t]here is clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). There was no such evidence here.

The social worker testified that she did not observe any "special connection or bond" between the father and child and that termination would not negatively impact the child. The father seemed to recognize this lack of connection, testifying: "I don't know anything about [the child] besides his name and what he likes to color and do. I don't know any of that personal information." With that candid admission, we find the father did not meet his burden to establish this exception should be applied. *See A.S.*, 906 N.W.2d at 476 (holding that the "parent resisting termination bears the burden to establish an exception" under section 232.116(3)).

**AFFIRMED.**